ping, evacuation procedures shall be implemented.

This passage can be read two other ways:

In the event the spillway discharge has reached 75% of capacity and weather information indicates that heavy rainfall will continue ... evacuation procedures shall be implemented.

OR

In the event ... surveillance at the site or at upstream reservoirs indicates a potential hazard other than overtopping, evacuation procedures shall be implemented.

(R.R. at 869a). It is not disputed that the spillway discharge reached at least 75% of capacity, if not 100%, while there was still heavy rain. Although there is no recognized duty to warn in Pennsylvania, I have concluded that a duty to warn was voluntarily assumed in this case, even though not statutorily imposed, when PG Energy drafted its EAP. Appellant, when it specified a series of alerts based on the level of spillway discharge, was the one entity in the best position to know how much rainfall and what circumstances would result in downstream flooding. However, because I do not believe that the failure to warn was the proximate cause of Appellees' property loss, I agree with the Majority that Appellant was not liable for the damage to the property of Appellees. The extent of the flooding was so great from the torrential downpours that warnings given by Appellant would not have averted the damage suffered by Appellees.

The occurrence of a major storm event will cause a dam to overtop because, due to the limitations of its spillway, the level of the water within the impound area will rise at a rate greater than the dam's capacity to pass that water over that spillway. Further, the corresponding pressure of a colossal volume of water threatens the very stability of the dam. We forever remember that the unique risks posed by dam structures, in combination with torrential rains, produced the devastating failure of an earthen dam on South Fork Creek outside of Johnstown, Pennsylvania on May 31, 1889. The resulting torrent swept away more than two thousand lives. Although the area had often flooded, the dam had always held. While we have designed many of our modern methods to ensure that there is no repeat performance of this tragedy, this goal is entirely dependent on the quality of construction, frequency of inspections, promptness of repair, and the presence and proper implementation of emergency action plans. Failure of any one of these poses an unnecessary and unacceptable risk to a downstream watershed. Therefore, I believe that Appellant, pursuant to the specific provisions of the Emergency Action Plan that it drafted, assumed a duty to warn those downstream when water levels triggered the actions mandated by that plan.

OFFICE OF DISCIPLINARY
COUNSEL, Petitioner

v.

Mohamed ALAMGIR, Respondent

No. 966 Disciplinary Docket No. 3.

Supreme Court of Pennsylvania.

Sept. 28, 2004.

*ORDER*

PER CURIAM.

AND NOW, this 28th day of September, 2004, there having been filed with this

Court by Mohamed Alamgir his verified Statement of Resignation dated August 16, 2004, stating that he desires to resign from the Bar of the Commonwealth of Pennsylvania in accordance with the provisions of Rule 215, Pa.R.D.E., it is

ORDERED that the resignation of Mohamed Alamgir be and it is hereby accepted and he is DISBARRED ON CONSENT from the Bar of the Commonwealth of Pennsylvania, and it is further ORDERED that he shall comply with the provisions of Rule 217, Pa.R.D.E. Respondent shall pay costs, if any, to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.